This is the People of the State of Illinois v. Elizabeth Drewes, 4090832. We have for the appellant, Peter Weisen for the appellate, Anastasia Brooks. Mr. Weisen. We have to release the court. Your Honors, in this case, while Judge Tifanis was correct when he ruled that the prosecutors, and I have to say it brazen disregard for the Mental Health Confidentiality Act was error, he erred in ruling that there was no reasonable probability that the outcome of this case would have been different. Strickland defines a reasonable probability as a probability that is sufficient to undermine the confidence in the outcome. Here, Gina Johnson's testimony, the therapist's testimony, clearly undermined the confidence in the outcome of this case, your confidence in the outcome of this case, and this sentence should be reduced or remanded for a new sentencing hearing. The prosecutor accomplished two things with Gina Johnson's testimony. She was able to draw attention away from Ms. Drewes' remarkable rehabilitative potential, and this testimony from the therapist exacerbated or magnified other evidence that was presented by way of aggravation. Ms. Johnson was the longest witness, and again, remarkably, Judge Tifanis did absolutely nothing while this witness was testifying. The judge isn't simply a referee. If Ms. Drewes' trial counsel was failing to object to this testimony, the judge has to know, should have known, or is charged with knowing that this testimony was violating the Mental Health Confidentiality Act, and he should have stopped it. You know, you read it, I think, twice in the statement of facts, and then in the early part of the argument, I listed some of the things that the therapist testified to, and it just turns this sentencing hearing on its head to hear a counselor testifying to allegedly what Ms. Drewes said in the counseling process. And it clearly affected this judge. This judge says, right before he condemns Ms. Drewes to the maximum period of prison and the maximum fine, says, I have to question what rehabilitative potential is given here, given all the attempts by everyone involved to try to deal with your problem before this event took place. Family members, police, counselors, everyone tried, and you turned your back on them and were absolutely defiant in an attempt to deal with your problem. That just was not the evidence in this case. Ms. Drewes did not turn her back on her family members. Family members testified that throughout the summer of 2008 that they had met with Elizabeth, talked to her, she agreed she needed help, wanted to get help. The judge is just wrong. The judge is blinded by this venom that is being spewed in the courtroom that should be in this courtroom. Other people, other witnesses testified that the long-term relationship that Elizabeth, other family members testified, the long-term relationship that Elizabeth had with the family, never, anyone had ever testified that Elizabeth turned her back on them. Mark didn't testify to that? Never did he testify that in some act of defiance she turned her back on Mark or her family. But there's no question that the trial court sentenced the defendant in line with the statute. It wasn't outside the limits as allowed by the statute. Isn't that correct? Aggravated driving under the influence carries a sentence of 3 to 14 years. So yes, he sentenced her within that range. Go ahead, you had a question. The way he got there, and that's the second part of the argument, the way he got there was to tell her that, hey look, you could have been sentenced, you could have been charged with first degree murder. He sat there and defined first degree murder and said it's knowledge that your acts could cause great bodily harm. You were properly charged, but you could have been charged with first degree murder. The Hill case that I cited is squarely on point here. That's the case where a defendant was sentenced to the maximum term of imprisonment for contributing to the delinquency of a child. It was a misdemeanor charge and he was sentenced to one day less than a year or 364 days. He appealed his sentence as excessive and the appellate court said, hey wait a second, judge, you commented that this person could have been charged with a felony and that's just wrong. You can't do that. You can't sentence based on your belief and in this case it's pretty clear that given the judge's comments at the motion to reconsider, judges get a chance to correct their errors at those hearings and this judge plowed right ahead and said, nope, you may think I'm wrong, but she could have been charged with first degree murder in this case. That's where the sentence came from, his belief that she should have been sentenced to a minimum of 20 years up to 60. That's where the sentence came from and that's just wrong. But in Hill, didn't the court actually fail to consider all the statutory factors also? In Hill, as I read the appellate court opinion, the appellate court noted that there was a good deal of mitigating evidence and whether the court, I don't remember that detail from the case, but that's also, so if you're reading the case and know that. I'm actually referring to Glass which referred to Hill, so that's why I asked the question. Glass says, Hill stands only for the proposition that a trial court abuses its discretion when it considers an improper factor not supported by the evidence or fails to consider all of the statutory factors in aggravation and mitigation. That comes from the state's brief and I don't think that's an accurate reading. It's actually a quote from the case. Pardon? It's a quote from Glass. It's a quote from Glass and I don't know what appellate judge wrote that, but Hill says what it says and it says that a trial court cannot consider whether, in sentencing, a trial court cannot consider whether a defendant can be charged or should have been charged with a more serious offense. However, in Glass, a judge interpreted that one way, but it says what it says. And if you want to use the Glass quote, this is an improper factor. The fact that Elizabeth Drewis in Judge DeFanis' mind could have been charged with first degree murder is, using the quote from Glass, an improper factor for the judge to have considered. But Mr. Wise, when I read those comments of the judge, taken as a whole, it seems to me that the court's responding to your argument that the defendant did not intend to cause the collision. I mean, it seems to indicate the judge is saying this is very serious conduct. Well, first of all, I didn't do the sentencing hearing. I know. I'm sorry. That's fine. But it isn't. The conduct is of a person who is under the influence of alcohol. She's charged with a strict liability offense. Driving under the influence carries no mental state. And if you go the wrong way on an exit ramp or an entrance ramp or whatever it was, and you end up going the wrong way on a highway, that's conduct that is indicative of a person who is driving under the influence of alcohol, not necessarily intentionally or knowingly. The judge, and I don't know, I don't think, but certainly I think that the trial counsel was arguing, hey, this is not intentional conduct as a mitigating factor. And the judge can certainly respond by saying that he pointed out, the judge pointed out that she drove around town throughout the day. That's indicative of nothing more than potentially some tolerance to alcohol. But to go one step further and say you could be charged with first degree murder, and of course, Judge DeFantis knows what the sentencing scheme is, it goes beyond simply responding to the argument that this was unintentional conduct. It goes far beyond that. Well, Mr. Weiss, I know this wasn't raised, but I have to ask. Isn't it possible there was a trial strategy involved and this should wait for a post-conviction so that we know what Mr. Welch had in his mind? I mean, as you know, this court tends to defer if that is an issue. There is no possible trial strategy to allowing this evidence to come in. And assuming for the, well, and of course, this isn't evidence either. Mr. Welch, well, never mind. There's nothing in the record. But even if, you know, even for the sake of argument, if there was at the beginning, once you start to hear what this person is saying, you have to abandon that strategy. Because this was, in a word, devastating. Absolutely devastating evidence that created a mob mentality. The record clearly shows that in this courtroom where you have, you know, you have this evidence and then you have victim impact witnesses getting up and going far beyond what's allowed in victim impact statements. She should have learned from her previous DUI. She should be sentenced to the maximum. That isn't what's allowed by a victim impact statement, but that's what this evidence created. It created a mob. And you have a judge that then goes on, you know, that swept up and starts talking about first degree murder. We all know Judge DeFantis has been around a long time. He was a state's attorney for many years. He sure has. And he should have stopped this. He should have stopped this. That's, you know, you're right. He should have, he's been around for a long time and knew, or should have known, that this evidence was wrong. And, you know, advocacy by the judge, as I said before, isn't merely a referee. For some reason, he sat there and allowed this evidence to be presented knowing that it violated the minimum. Mental Health Confidentiality Act and allowed this stunningly harmful testimony to be presented. And not only that, he commented on it when he sentenced. So he clearly listened to it, and it clearly affected the outcome of this case. This is not a case where the maximum sentence was appropriate. This is a woman who had, you look at her life history, and but for the last 15 months of her life, was a remarkable person who took care of disabled siblings, who took care of another disabled person at the University of Illinois, while playing sports, while graduating with honors, you know, steps out of college, starts with craft foods, works there for almost 30 years, mentors other women so they can rise to the ranks and accomplish what she's accomplished. And when that becomes too much and becomes, you get depressed, she understands she needs counseling. Starts counseling, then in the last 15 months before this event happens, develops these relationship problems, takes a precipitous slide, starts counseling. Much of it, it's interesting, if you excise this testimony from this counselor, you hear a far different Elizabeth Drewis, even from the witnesses in aggravation. You hear Jill Tepmore testify, I helped her find a counselor, she started going to counseling, it was working, she didn't like this particular counselor, she said she'd get another one. That's far different from what Gina Johnson has to say. You have Mark Drewis testifying that he went there in June of 2008, talked to his sister about her alcohol use, and took her to a doctor's appointment, encouraged her to get help, she was receptive to that idea, that's his testimony, unimpeached, and she listened to what her brother had to say, she said she should think about it. Then, after the DUI arrest in September, she completes counseling at the Carl Clinic, the probation officer put that in her report to confirm that, and then after this event, while she's in jail and her bond's at $5 million or whatever it is, and she's not posting bond, you have the witness who testifies while in the jail, she's attending NA and AA meetings, she's counseling younger people in the jail, she's making peace, I don't know if it's the judge, or I think it was the judge who said, hey, that's too little, too late. Any judge that says that has no conception, or is blinded by what has happened in this courtroom, there is no effort at rehabilitation that is too little, there is no effort at rehabilitation that is too late. None. And for this judge to have said that, shows how he was affected by this. Do you want us to ignore what she did? She being the prosecutor? No, absolutely not. That's why there's a sensing range, there's a relatively broad sensing range in this case of 3 to 14 years. And you can certainly consider what she did, and what she did unintentionally, under the influence of alcohol, killing another person. And that was within 2 or 3 months of a prior incident, is that correct? She was arrested for driving under the influence, that's correct. Mr. Weiss, wasn't there some evidence that could allow you to infer that she purposely went the wrong way on the highway? I thought there was a witness who testified who was on the highway, saw her coming at him, got out of the way, and indicated that she would have seen these other cars, and it appeared that she was bent on, I would guess you would say suicide. Well, there were drivers that testified that she was only on the highway for a relatively brief period of time. Probably from where the ramp should have come up, it's half a mile or less. So 20 seconds, I don't know how fast she was going. But it's very difficult for a witness to testify what was in somebody else's mind. But there was some testimony to that effect, where somebody could infer perhaps that she was intent on driving the wrong way on purpose. But you're arguing there was no intent here at all. I am arguing that there's no intent, because first of all, she told her friend that morning that there's a conversation, and Jill Moore testified that Elizabeth had mentioned suicide, and Jill Moore said, hey, I'm going to call the police, and Elizabeth said, hey, come on, that's not me, you know that. Plus, you know, you want an inference? She had her dog in the car that she loved. You know, I'm sorry, dog lovers aren't going to take their dog in the car if they're held on suicide and the dog gets killed too. That's not going to happen. I mean, that's an equally strong inference in my mind. I want to ask you another question, because my experience in the trial court was always that when a mental health expert or counselor of Gina Johnson's ilk was called to testify, they would always insist on a court order before they would testify. A subpoena was never enough. Did she resist at all, or was there a court order? What happened there? There is nothing in the record. I don't think you want me to tell you what, since it's not in the record, you don't want to hear what my conversation was with the state's attorney of the county. But Mr. Weiss, why isn't there an implicit waiver when you put her mental condition, or when her attorney put her mental condition at issue? Because he was drastically ineffective. Implicit waiver, you can't waive it. There's nothing in the act that says, if an attorney falls asleep at the switch, that that works as a waiver. That's why we have, and that's why the court ruled, and that's why the state has conceded that there was ineffective assistance here. No, I'm sorry, Judge. I strongly disagree that there's any concept of implicit waiver here when the statute is so clear. Not only that, but the purpose of the statute is to make sure that a person with mental health issues can go into treatment and say everything they need to say with the confidence that this is not going to be used against them at some point in time. Just as a waiver. Just so counsel knows, there was a failure of the clerk to provide us with the full record. We had to request that the record be supplemented. I'll tell you specifically, there were the five letters written on behalf of the defendant and disks that were not in the record. I'm not indicating counsel is at fault in any way. I just wanted you to know it is an issue regularly. Ms. Brooks? Thank you. May I please the court and counsel? My name is Anastasia Brooks and I represent the people in this case. I notice the defendant's claim that the state is conceding ineffective assistance and I'm not sure what the state of the record was below in terms of what the trial prosecutors had to say with respect to the element of the incompetent representation, objectively unreasonable assistance. I'm not sure I even addressed that in my brief. I relied solely, I thought, on the Strickland second prong of prejudice. Defendant's failure to establish sufficient prejudice as well as the fact that the trial court had ruled that the prejudice is actually an element of an ineffective assistance claim. I don't think it's entirely accurate for the defense to characterize the state as having conceded ineffective assistance. So for that reason, I like to focus mostly on the prejudice prong when I give my argument. The other thing that comes up here... You don't get to prejudice if you don't concede it, right? I'm sorry, you can always just address prejudice. Strickland allows you just to jump to the prejudice prong. You don't have to consider whether the counsel's conduct was incompetent or objectively unreasonable. You don't even have to get there if you say that there was insufficient prejudice. Well, this was pretty prejudicial testimony, wasn't it? Prejudice has to be considered in the context of what the defense says is, does this undermine confidence in the outcome? Is there a reasonable probability of a different result? And here, as the state's brief points out, what the defendant actually told her therapist was nearly cumulative of what was already obvious about the defendant's attitudes towards her DUI. Cumulative, but still, you have to admit the testimony is prejudicial. Prejudicial in the sense that it hurts her case, and if it should not have been admitted, it makes her case... It's damaging to her case, sure, in the sense that if it was not admitted, then the trial court wouldn't have heard this testimony, which hurts her case, but it's not prejudicial in the strickland sense, because although this came in, there was still enough evidence, overwhelming evidence, to show that she had all these extremely poor attitudes towards her heavy drinking, which was excessively heavy drinking and frequent, and that with her attitudes with respect to her first DUI, the fact that she completed this Carl Clinic treatment, which I'm not sure if that was inpatient or outpatient, but apparently didn't, as the trial court observed, didn't do her any good, because she's back out drinking again, then gets broken up with her partner, and then goes out on this fateful trek here onto the interstate the wrong way, and ends up killing somebody, and injuring, seriously, three other people. So, for those reasons, it's not going to undermine his confidence in the outcome. There's already enough for the judge, overwhelmingly, to reach the conclusions that he did, and impose the maximum sentence, even though there's this extra information about what was said during counseling that sort of makes that just a little more apparent. Now, the defendant's main argument here is, well, it affected the entire proceedings. Now, the judge is... There's not really any record support for the defendant's claim here. One of her central claims is that somehow this is now causing the judge to disregard all this evidence in mitigation, or somehow it has a synergistic effect on the other evidence in aggravation. So, those are things the defendant would have to persuade this court of in order to get relief under either the second prong of plain error, denial of a fair sentencing hearing, which would be analogous to what happened in the Blue case, according to the defendant. Well, how is this not the same as the Hill case? Okay, well, with respect to the next argument, whether the trial court erroneously considered the elements of first-degree murder, Hill is not on point for the reason that it's effectively overruled by the later cases of LaPointe, and also there's contrary authority, effectively, in what's state-cited in Banks, where the defendant was charged with a lesser range of a controlled substance, but had a lot more in his possession and was willing to deal a lot more, so therefore the judge considered that an aggravation, what the defendant could have been charged with, rather than what he actually was convicted of. And so, it's sort of like LaPointe in the sense that LaPointe allows judges to consider evidence of uncharged crimes. Whether the defendant was charged or convicted is not controlling as to its admissibility. That's what LaPointe says. So essentially, the defense is citing Hill for this sort of like blanket per se rule that, well, if it's not charged, it can't be considered. Well, that's not valid after LaPointe, so therefore this court shouldn't be following Hill for that reason. And with respect to the other first prong of plain error, I'm not sure if the defendant makes this argument, but whether the evidence was closely balanced towards leniency. Now, the defendant does a good job of citing all of her attributes with respect to her family life and her education or prior employment, but there's sort of two major sides to her in the sense that the caring family member, the diligent worker, and the person who has contributed value to society, versus the person who got involved in heavy drinking, whose life spiraled downhill and ended up not just with one DUI, but the first DUI arrest where the PBT was so high, the portable test was so high, I think it was over .3, that they had to take her to the hospital instead of jail because at that level, alcohol can become so toxic that she would need medical treatment for it. So then, at the hospital, she's eventually tested down with the breathalyzer at .284, that's the first DUI, which is very remarkably similar to her second DUI, where at the hospital again, she's testing .283. So, these are extraordinarily high blood alcohol levels, and it's showing somebody who's not just a casual drinker, social drinker, had one too many, went out on the road, somebody who was flying down the interstate the wrong way around 1 in the afternoon after having drunk herself to a very high level of toxicity. Ms. Brooks, tell me, I mean this is obviously a very tragic case, the testimony of the counselor was quite frankly riveting. What, compare for me, what testimony there was in the evidence that makes the counselor's testimony cumulative? Sure, Your Honor. Well, it starts out when the defendant cites her brother's testimony, and she's, quote, receptive and thinking about this notion that she's got to get some form of treatment, but she's not really doing anything about it. Instead, she continues drinking. That was back in June of 2002. She gets the first DUI. She goes through this therapy, which is not doing her any good because she's still drinking heavily. She still picks up at the second DUI, which she's charged with now. And so for those reasons, it shows her poor attitudes towards treatment, the fact that... Is there the testimony about the rages, the violence, without the counselor? Yes, there's her belligerence when the police show up and the firemen show up at her house, and they're trying to take her to the hospital, they're trying to take her for treatment. She had agreed with her partner that she was going to go and get treatment. The next morning, she's drinking. She's not wanting to go. The police or ambulance is called. And she's physically escorted, not just once on that day, but another day as well, towards the hospital for treatment for her drinking. So it's like if she's having to be dragged kicking and screaming on the way to treatment, then what she says to her counselor about, oh, well, DUIs aren't a big deal, and she doesn't really care about treatment, and she thinks she should be in charge of the 12-step groups and stuff like that. That's just kind of extra stuff that was on top of all of the evidence about her resistance towards getting her treatment, not just from her family and her partner and the police and the ambulance and the firemen. Everybody that comes into her life, as the trial court said, she turned her back. Well, sort of blowing off the idea, the notion that, well, yeah, I'll do it, maybe. I'll think about it, but she doesn't really follow up on it. That's not really active defiance like she's telling off her brother, but it's more subtly. It's just like, well, she doesn't really care what her brother had to say. She just kind of took it in to avoid the interference with her drinking. And the fact that when she told her therapist, or not her therapist, the financial advisor, her name was Moore, I believe, and she was talking about killing herself that morning. And when Moore says she's going to call the police, and then she says, no, I didn't really mean it, she wouldn't really do it. Well, the other inference to that is, other than the one the defendant suggests, is maybe she doesn't want Moore to call the police so that Moore and the police might interfere with her planned suicide attempt. So there's inferences that can go both ways, but the question is, does the record support the inferences that the trial court drew about the defendant's mental state? Now, the mental state, as the defense points out, this is a strict liability offense. There's no mental state for this aggravated DUI, which means that the judge can consider mental state an aggravation because this is not an element of the offense. The judge can't say, well, I'm going to increase your sentence because you killed somebody because that's an element of the offense. But if she intended, or at least acted knowingly, when she drove the wrong way in the interstate, and the substantial probability of death or great bodily harm should be immediately apparent from a massive Cadillac Escalade she was driving the wrong way, the great speeds that were involved, both lanes of traffic converging, the fact that she didn't slow down, she didn't swerve, and when the car caught fire, she's like, get my dog out, but she's not really cooperating with getting out of the car. People are around her trying to bust out the window. And then the fact that when she's actually out of the car, she's like, I want my lawyer, and she doesn't really care about the fact that now there's somebody at that scene who's dead. And this just calls for disregard. And now she's changed her tune. She's now remorseful. She's now helping in jail. She's trying to be a role model to other people who have trouble with alcohol. And the trial court correctly recognized, yeah, that's too late. Now the trial court didn't totally discount the fact that her expression of remorse and her rehabilitative efforts are coming so late in the game, but the trial court should credit that. But the trial court doesn't have to consider all of her mitigation, the family life, the employment, the education, her recent rehabilitative efforts. The trial court is still not required to reduce the sentence from the maximum. So the trial court did not abuse its discretion by imposing the maximum 14-year term. Merely because she has rehabilitation or rehabilitative potential or because she said she was sorry. And the consideration of the victim impasse statements, it's not fair to characterize this record as a mob mentality. These are victims who have been seriously injured, who have suffered a great loss, and who have merely recommended, in their opinion, from their perspective, that the maximum sentence needs to be imposed. An eminently reasonable idea in the sense that she wasn't deterred by her first DUI. There's very great levels of blood alcohol content involved here. The trial court couldn't consider an aggravation of the one death, but then you have the three extra people who were seriously hurt. So the nature of the offense here, the mental state, the extra injuries, the need for deterrence, which the trial court most heavily emphasized, which cries out in a case like this, which is an easily deterrable offense. And just the fact that this is such a heinous crime, that it's so overwhelmingly supported by the record, this maximum sentence, and the properly admitted evidence in aggravation, that even if this issue with respect to the therapist's privilege was not forfeited, which it was forfeited, the state would still have a compelling argument with respect to harmless error. How much time will she serve? What is she subject to? I believe it's 85%. This is a substantial sentence, but also realize this sentence is a serious, this offense is a serious crime for a very good reason, because somebody dies. And that doesn't even require her to have any mental state. So the fact is that this could have been charged as first-degree murder. Perhaps it wasn't. Maybe the prosecutors are thinking, well, can we really prove this beyond a reasonable doubt? Because voluntary intoxication can negate the mental state for murder. That's a powerful argument she may have to a charge of first-degree murder. Maybe that's why they went under this case, this discharge where the evidence was overwhelming, she had no defense, and I believe she pleaded guilty. I'm not sure if that was, I think that was the case. Yes, she pleaded guilty. So this was appropriately charged. Whether it could have been charged something else, it would have been difficult to prove given her voluntary intoxication, which was at a very high level. But she was obviously very functioning enough, is that she could drive through traffic, she could make her way onto the interstate, and she could successfully drive as far as she did on the interstate. So it shows that despite her high level of toxicity, she was still able to function inside her vehicle. So the argument whether she knew what she was doing when she turned the wrong way, down the wrong way ramp onto the interstate, could be established circumstantially by her statements about wanting to kill herself after a partner left her, and about the other circumstances that happened at the scene after the crash. So for all these reasons, the state requests that this court affirm the sentence. And I have no further arguments if I'm receptive to questions. No, thank you. Thank you, Your Honor. Mr. Weisberg, that'll be it. First, to dispatch this argument that this LaPointe case, the Supreme Court LaPointe, somehow overrules Hill. Completely different issue. It is completely appropriate for a trial court in a sentencing hearing to consider other uncharged or unconvicted conduct. Your Honor, we'll soon learn in federal court that there's a word for it. In federal court, it's called relevant conduct. That's part of the federal sentencing guidelines. In our state system, that evidence has to be relevant and come from a reliable source. Considering that evidence, which is approved by LaPointe, is completely different from what the trial court did here and consider a completely different charge, a more serious charge, that Ms. Drewis didn't have notice of and didn't have an opportunity to defend. So Hill has nothing to do with LaPointe. Second, the therapist's evidence isn't nearly cumulative.  Her testimony painted Elizabeth Drewis as mocking, that kind of mocking, derisive attitude towards her counselor and the counseling process. The other evidence didn't indicate that at all. What's all the evidence from the September 30 arrest until this next arrest? What did that show? That's exactly where I was going. The police officer testified. I think there's three occasions where the police were called to Elizabeth's home by the partner. The police officer testified, what happened was no different than many other encounters I have with an intoxicated person. As we testified to, one of the police officers said, this is what we see. Plus, she went to counseling during that time frame at the Carl Clinic. And imagine that, an alcoholic, a person with an alcohol problem, who doesn't take to counseling right off the bat. That's the nature of counseling for a person with alcoholism. So this wasn't merely cumulative testimony by a long shot. The other issues here, of course, the suicide argument, the state didn't raise that at the sentencing hearing. The motion to reconsider comes up in its brief, so it's waived. But there's just simply no evidence of that. I think the prosecutor says it best, when there is a synergistic effect between the indemnisible testimony and what happened in this courtroom, that's why this is indemnisible. And this is like Bill, where this just turned this hearing upside down, and this court needs to do something. Thank you. Thank you, Mr. Weiss. We'll take this matter under advisement and reassess.